Harold J. NONNENMACHER

v.

The CITY OF WARWICK, et al.

Donald E. Sjogren

v.

The City of Warwick, et al.

Nos. 97–528–Appeal, 97–529–Appeal.

Supreme Court of Rhode Island.

Jan. 25, 1999.

Kelly M. Fracassa, Westerly, for plaintiff.

Kimberly Ann O'Connell, Providence, for defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

The plaintiffs, Harold J. Nonnenmacher and Donald E. Sjogren, filed suit under 42 U.S.C. §§ 1983 and 1988, claiming that § 7–75.2(b) of the Warwick Code of Ordinances (1993), violates Article 1, section 10, of the Contract Clause of the United States Constitution [1] because its setoff provision required a reduction in disability pension benefits paid to retired firefighters whose earned income during retirement exceeded certain limits. The plaintiffs and the defendants—the City of Warwick, the members of the Warwick Board of Public Safety, individually and in their official capacities, and the Warwick City Treasurer, individually and in his official capacity—filed motions for summary judgment. The trial justice denied the plaintiffs' motions for summary judgment and granted the defendants' cross-motions for summary judgment. We affirm the trial justice's finding that the ordinance does not violate the Contract Clause because it advances legitimate governmental interests. We reject, however, the findings that the plaintiffs' disability pensions vested prior to their disabilities and that the ordinance "substantially impaired" their right to a disability pension. A summary of the facts of this case follows.

---

1. The Rhode Island Constitution contains a similar Contract Clause, see R.I. Const., art. 1, sec. 12, but this provision was not argued by the plaintiffs.

## Facts and Procedural History

The Warwick Board of Public Safety (board) is responsible for administering the firefighters' pension system of the city of Warwick (city). At the time these suits were filed, the members of the board were Robert Donohue, Marshall Martin, and Dianna Pearson, and the city treasurer was John E. Martin, all of whom were named as defendants in this case. Until 1977, whenever a firefighter retired because of a disability, the board granted a pension varying in amount from 50 percent to 75 percent of the firefighter's then current salary. The ordinance in effect at that time granted the board wide discretion in providing disability pensions but set a floor of "an annual sum not less than 50% of *** highest salary ." Warwick, R.I., Ord. No. O–61–101, § 5–47 (May 18, 1961). On March 9, 1977, the board adopted a rule establishing 66 2/3 percent of the salary as the fixed rate that would apply to all pending and future cases in which firefighters retired because of service-related injuries. Thereafter, in January 1980, the Warwick City Council (council) adopted an amendment to the Code of Ordinances which provided that all permanent firefighters placed on the pension list as a result of a service-related injury "shall receive a sum of sixty-six and two thirds (66 2/3%) per cent [*sic* ] of his highest salary," subject, however, to a potential limitation when such firefighters received earned income from other employment. Specifically, § 7–75.2(b)[2] of the Warwick Code of Ordinances (1993) provides, in pertinent part:

> "The officer or member's pension amount for the following six (6) months after the filing of the report of earned income *shall be reduced dollar for dollar by any amount that the actual earned income exceeded the salary paid to an officer or*

---

2. When originally adopted in 1980, the limitation was contained in § 7–75.2(a) of the Warwick Code of Ordinances. In 1993, § 7–75.2 was amended. The limitation previously contained in subsection (a) is now located in subsection (b).

3. Sjogren was initially retired by the board on September 10, 1981 due to a non-service-related disability, but the board changed his retirement status to a service-related disability on September 12, 1984.

*permanent member* with the retired member's highest rank and seniority on active duty at the time such reports are filed. *However, in no event shall any officer or member on pension receive an annual sum less than fifty (50) percent of his highest salary as a fireman."* (Emphases added .)

The plaintiffs became permanent members of the Warwick Fire Department (department) in 1967. During their employment and continuing to their retirement, sums were deducted from their salaries and placed into a pension fund as required under the Warwick Code. The board retired plaintiffs due to service-related disabilities *after* the enactment of § 7–75.2(b).[3] At the time of their retirements, both plaintiffs held the rank of lieutenant. In addition to being permanent members of the department, plaintiffs were employed privately prior to the 1980 enactment of what is now § 7–75.2(b), and they continued in private employment after retiring from the department. During plaintiffs' retirements, the board sought "refunds" of pension benefits from plaintiffs because their earned income exceeded that which lieutenants in the department then were receiving.[4] The plaintiffs then filed separate complaints under 42 U.S.C. §§ 1983 and 1988, contesting the constitutionality of § 7–75.2(b) as applied to their pensions. Because the cases contained similar facts and legal issues, the Superior Court heard and decided the cases together.

The trial court found that plaintiffs had vested contract rights to their disability pensions prior to the enactment of § 7–75.2(b) and that § 7–75.2(b) worked a "substantial impairment of their aforementioned vested contractual rights as it could potentially cost the Plaintiffs a significant amount of money

---

4. In March of 1993, the board requested that Nonnenmacher refund $3,344.69 of his disability pension pursuant to § 7–75.2(b) of the Warwick Code of Ordinances, and he complied. In March 1994, defendant John E. Martin, in his capacity as treasurer, requested that Nonnenmacher refund an additional $1,447.24 on the same ground. Nonnenmacher refused to pay this amount. On September 26, 1995, the board requested that Sjogren refund $4,362.74 of his disability pension paid during 1992. Sjogren refused to refund this amount.

in compulsory reimbursements." The court concluded, however, that the ordinance did not violate the Contract Clause because the enactment was a "reasonable and necessary means of advancing the government's legitimate interest in flexibility" and "further[ed] the public interest in fiscal responsibility." Accordingly, the trial justice issued final judgments in both cases, denying plaintiffs' motions for summary judgment and granting defendants' cross-motions for summary judgment. The plaintiffs' appeals of the entries of summary judgment for defendants were consolidated by this Court for briefing and oral argument.

## Standard of Review

It is well settled that this Court conducts a *de novo* review of the granting of a summary judgment. *Woodland Manor III Associates v. Keeney*, 713 A.2d 806, 810 (R.I. 1998). Accordingly, if after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law, then we shall affirm the grant of summary judgment. *Id.* In addition, the determination of whether a contract exists is a question of law that this Court reviews *de novo*.

## Contract Clause

The Contract Clause of the United States Constitution bars states from enacting "any *** law impairing the obligation of contracts." U.S. Const., Art. 1, sec. 10. "Though the Framers apparently had in mind only purely private contracts (particularly debt obligations) *** the Clause routinely has been applied to contracts between states and private parties. *See, e.g., Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 137–39, 3 L.Ed. 162 (1810)." *McGrath v. Rhode Island Retirement Board, Etc.*, 88 F.3d 12, 16 (1st Cir.1996). The Clause speaks only of the impairment of a contract by a state, but it has been interpreted to apply to municipalities as well. *Northern Pacific Railway Co. v. Minnesota ex rel. Duluth*, 208 U.S. 583, 590, 28 S.Ct. 341, 343, 52 L.Ed. 630, 633 (1908).

The United States Supreme Court has developed a three-part analysis for determining whether a modification of a state or municipal statute results in a violation of the Contract Clause. *General Motors Corp. v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105, 1109, 117 L.Ed.2d 328, 337 (1992). A court first must determine whether a contract exists. *McGrath*, 88 F.3d at 16. If a contract exists, the court then must determine whether the modification results in an impairment of that contract and, if so, whether this impairment can be characterized as substantial. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–12, 103 S.Ct. 697, 704–05, 74 L.Ed.2d 569, 580–81 (1983). Finally, if it is determined that the impairment is substantial, the court then must inquire whether the impairment, nonetheless, is reasonable and necessary to fulfill an important public purpose. *Id.* This three-part analysis has been applied by this Court in *Rhode Island Depositors Economic Protection Corp. v. Brown*, 659 A.2d 95 (R.I. 1995), where we sustained a statute that eliminated the right of nonsettling parties to seek contribution from settling parties in the credit union crisis, and in *Retired Adjunct Professors v. Almond*, 690 A.2d 1342 (R.I. 1997), where we held that the retroactive application of statutory amendments did not substantially impair an alleged contractual right to employment after retirement.

A Contract Clause analysis also must interface with the consideration that statutory enactments do not create contractual relationships unless such legislation evinces a clear intent to do so. The United States Supreme Court has explained that "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.' " *National Railroad Passenger Corp. v. Atchison, Topeka & Santa Fe Railway Co.*, 470 U.S. 451, 465–66, 105 S.Ct. 1441, 1451, 84 L.Ed.2d 432, 446 (1985). Moreover, the party asserting the existence of a contract bears the burden of overcoming this presumption. *Id.* at 466, 105 S.Ct. at 1451, 84 L.Ed.2d at

446. *See also Retired Adjunct Professors,* 690 A.2d at 1345 ("there is a strong presumption against construing a statute to create such contractual obligations, and individuals alleging its creation bear the heavy burden of overcoming this presumption"). In order to overcome the presumption, the party must prove that "the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." *United States Trust Co. of New York, Trustee v. New Jersey,* 431 U.S. 1, 17 n. 14, 97 S.Ct. 1505, 1515 n. 14, 52 L.Ed.2d 92, 106 n. 14 (1977).

 In applying these principles to the case before us, it is our opinion that § 7–75.2(b) did not work a substantial impairment of a vested contractual right because the amendment in question, § 7–75.2(b), was passed *before* plaintiffs acquired any vested rights. The ordinance in effect at the time plaintiffs became permanent members of the fire department stated, *"Whenever* an officer or member of the permanent fire department *shall become unfit* to perform active duty by reason of mental or physical infirmity, or other causes, the board of public safety *may place* such officer or member upon the pension list and *thereafter he shall be paid* for the remainder of his life." Warwick Code Ord. No. O–61–101, § 5–45 (May 18, 1961). (Emphases added.) The language of this ordinance does not evince an unmistakable intent to create a vested right to disability pensions *prior* to the occurrence of the disabling event. Rather, the language connotes futurity and the possibility of occurrences: whenever the firefighter *shall* become unfit, the board *may* place the person on the pension list, and *thereafter* he *shall* be paid. Clearly, this language does not signify any immediate vesting. We took a similar position in *Lavergne v. New England Teamsters and Trucking Industry Pension Fund,* 494 A.2d 1185, 1188 (R.I.1985), in which plaintiff's eligibility for a disability pension was fixed as of the date of his disability and vested as of that date.

Accordingly, we hold that plaintiffs did not acquire a vested right to a disability pension until the time they sustained their disabling injuries. Because the 1980 amendment was enacted *before* their disabilities occurred, neither plaintiff suffered impairment of any vested contractual right.[5] Although plaintiffs could expect that disability benefits would be paid to them, "[t]he mere fact that a [city] enacts laws that benefit the interests of some people does not automatically create contract rights to those benefits." *Retired Adjunct Professors,* 690 A.2d at 1345. Because plaintiffs in this case did not possess vested contractual rights to disability benefits at the time the ordinance was enacted, no impairment of contract within the meaning of the Contract Clause resulted from its enactment.

In any case, even if plaintiffs did possess vested contractual rights prior to the 1980 ordinance, the alleged impairment was not substantial. The plaintiffs have claimed that their right to a disability pension vested in 1967, at the time they became permanent employees of the fire department. In 1967 and until 1977, the board awarded disabled firefighters pensions varying in amount from 50 percent to 75 percent of their salaries. Even assuming that plaintiffs acquired a vested right to disability pensions in 1967, this right provided, at that time, a minimum of 50 percent of their salaries should they become disabled. The 1980 ordinance also contains a 50 percent minimum pension benefit. Therefore, even were there a vested contractual right, plaintiffs' impairment under the ordinance would not necessarily have been greater than it would have been under the applicable policies that were in effect at the time of their 1967 employment.

Moreover, assuming arguendo that the ordinance worked an impairment of a vested contractual right, plaintiffs' Contract Clause challenge fails insofar as we agree with the trial court's determination that § 7–75.2(b) is a reasonable means of fulfilling an important public interest. *Energy Reserves Group, Inc.,* 459 U.S. at 411, 103 S.Ct. at 704, 74 L.Ed.2d at 581; *Retired Adjunct Professors,*

---

5. Our holding in this case addresses whether plaintiffs had vested contractual rights to *disability* benefits at the time the ordinance was enact-ed. We express no opinion here on the question of when a *retirement* pension vests.

690 A.2d at 1347. The two limits imposed by the ordinance, namely, the 66 2/3 percent maximum pension and the setoff provision, are reasonable restrictions designed to protect the solvency of the city's pension system. After retiring on disability pensions, plaintiffs here, at some point, earned income from outside employment that "exceeded the [full] salary paid to an officer or permanent member with the retired member's highest rank and seniority on active duty at [that] time." Warwick Code Ord. § 7–75.2(b) (1993). The ordinance merely restricts members' disability pension benefits, in such situations, to a minimum of 50 percent of their pre-disability salaries.

The availability of disability pensions is an essential feature in assuring individuals considering careers in public safety that, should they be injured in the performance of their high-risk service, they and their families will be provided for. The ordinance helps to preserve disability pensions for former public safety employees whose disabling injuries may prevent them from further employment. The city has discretion to adopt the reasonable setoff restriction that serves to protect the solvency of the pension system and thereby serves an important public purpose.[6] It is our conclusion that § 7–75.2(b) represents an economic regulation that bears a rational relationship to a significant and legitimate public purpose.

Therefore, for the foregoing reasons, we deny and dismiss the plaintiffs' appeals, affirm the summary judgments entered in the Superior Court, and return the papers in the case to the Superior Court.

---

**6.** Until six years ago, "40 percent of all Warwick public-safety employees who retired were awarded tax-free disability pensions. It was common to see 5 to 10 Warwick firefighters retiring on disability every year." The Providence Sunday Journal, August 3, 1997, at 1997 WL 10845824. Similarly, "[b]etween 1990 and 1995, 80 percent of the [Providence] police or firefighters who retired did so on disability." The Providence Journal–Bulletin, June 12, 1997, at 1997 WL 10836984. Such disability status is advantageous because it provides tax-free income.